The first case on the calendar, United States v. Stegman. Good morning. Good morning, Your Honor. May it please the Court, I'm James Egan, I represent Defendant Appellant Joshua Stegman. If it please the Court, I'd like to focus this morning on the three-challenge wiretap warrant, that is the jurisdictional issue, the necessity issue, and the sealing issue. So I'll start with the territorial jurisdictional issue, and hopefully receive the 28-J letter citing the Tenth Circuit decision in Dada, which held that a warrant almost identical to this one failed the territorial jurisdictional element requirement of 2518.3. And because it did not limit interception to the state, the jurisdiction of the issuing judge, did not limit jurisdiction interception to where the phone calls would be intercepted, and where the wire room would be intercepted, just as in this case. That failure renders the warrant insufficient on its face, because it doesn't limit jurisdiction to the territory of the issuing judge. Dada court didn't suppress the evidence, because it found that the jurisdictional element is not core, doesn't bear on the core issues that Congress had in mind when it passed the wiretap statute, that is privacy and uniformity. That case, it doesn't help you much, does it? It helps me establish the violation, but not suppression. But it does cite to the DC Circuit's case in Glover, which holds that a warrant that is insufficient on its face, and failing to limit jurisdiction, requires suppression under subsection 2. It's a mechanical issue. You don't get into the core issues of privacy and uniformity. But even if you did, suppression would still be required for the reasons that Judge Damascus in his concurring opinion in North, which we cited in the brief. Assuming you find a violation, and that you find suppression under 251810A, then the question is whether the government can come forward with evidence establishing that whatever evidence was collected pursuant to the search warrant, that is the evidence that supports the indictment in this case, is untainted. And that's their burden under principles established in the Supreme Court case Alderman. And that would be, essentially, they're asking for a severability analysis of the warrant to sever or excise the invalid portions, the wiretap evidence from what they claim is a valid warrant. And they argue that they can satisfy probable cause even with that deletion. So why don't you tell us why we shouldn't be persuaded? OK. Well, if I can just, obviously, we think that that's an issue that should be rendered by the district court in the first instance, where it can make sure that the warrant is amenable to severability in the first instance. But assuming that it is, our argument is that the remaining evidence is mostly CI information. The staleness, whether it's stale, has not been, whether it's not stale, has not been established by the government. And also, they rely on Stegman's criminal history. Both of those don't really establish with any certainty that Stegman was, at the time of the warrant, had the contraband at his house and was engaged in whether a conspiracy or possession with intent to distribute that time. That issue applies also to the necessity challenge. The necessity is a little bit easier. It doesn't have that intermediate step. Is this value back to the wiretap on necessity? Yes. Yes. Yes. Before we get to necessity, I mean, the wiretap was issued by a judge in Berkshire County, Massachusetts, right? Correct. And it was first heard, the content of the conversations were first heard by officers in Berkshire County. Where's the violation? Well, so assuming that's true, the issue is whether it's on its face satisfies the jurisdictional requirement of 2518.3. It's not whether, in actuality, they in this case, first to be heard in Berkshire County. But assuming you do get beyond the face and get to what actually is alleged to have happened, the record isn't as clear as they would like. What's actually alleged to happen is that it was issued by a judge in Berkshire County and it was first heard in Berkshire County. I mean, I certainly would agree that this is not much of a limitation that's sufficient to serve anybody's privacy interests. But the wiretaps were passed through a center in a different county, Middlesex, and then it was listened to. And if that's the test, then it seems to me that it was satisfied. And that's a test if the warrant application and the warrant order, or the authorization order, says that, like in Rodriguez, where they said, we're going to listen to all these calls in the southern district. The calls are going to be in New Jersey or other districts outside the southern district. But we're telling you, Judge, and the judge is saying, you're going to listen to these here. That's not what happened in this case. The order itself gives officers the ability to listen to calls wherever the calls are made and wherever the wire room is made, whether in Massachusetts or outside of Massachusetts. Does our Rodriguez precedent address this? I think the government said that our Rodriguez precedent said that the hearing of the monitoring in the jurisdiction satisfies the problem you're addressing. Is that not correct? It satisfies the problem of whether they can listen to calls in Berkshire counties from telephones that are outside Berkshire counties, yes. But it doesn't satisfy the problem of the facial invalidity of the warrant and that it's not limited to Berkshire County, or indeed the Commonwealth of Massachusetts. It gives them permission to intercept calls wherever those calls are made and where the wire room is located. Rodriguez doesn't deal with that issue, the facial issue. So is there authority to the effect that if the warrant fails on its face to contain that limitation, even though that limitation was observed, the observance of it is of no import because it's on its face invalid and therefore excludable? Yes. Why is that? Why isn't it the same as any omitted fact that now that we know that they were only prepared, they were only going to listen to it within a certain range, why don't we put that in the warrant the way we would correct any omission in a warrant? Oh, I see. Well, I think you can do that, perhaps, to the application because that seems to be what subsection 1 of 2518.10a is aimed at. But 2 is clear that it's aimed only at whether it's insufficient on its face. And so it's a facial analysis. You don't get to. OK, so one case tells us that if the warrant doesn't contain something that limits it in that way, whether it fails particularity or whatever, but the execution comports with the law that the remedy is suppression of all evidence obtained, what case would we look to for support? Well, I don't know that there is a case either way on that question. There's cases that say at the dot of the 10th circuit where it's not observed and it's not suppressible. And then Glover where it's not observed and it is suppressible and it's not observed where the warrant, in that case, it's a different, I guess, as I understand it, it's a device put into a truck. And here we would definitely have to adopt your argument that Leon doesn't apply to this because the officers had a warrant and they executed it in conformity with the law. So it would be hard to argue that we don't have good faith here, right? Right. There are some cases that talk about good faith and say that it doesn't apply to Title III. I understand. Yes. But to the heart of your question, I guess it's not clear to me that they did limit the interception, that the wire room was solely located in Berkshire County. There's some language that is kind of loose in the testimony of Lieutenant Scott, I believe, who says that one of the listening posts, one of the wire rooms, is located in Berkshire County. He doesn't say that another one is outside, but it's not clear that it is solely within Berkshire County. You were going to talk about three things. One of them was going to be sealing, and we've taken up all your time. If you could get to sealing and could you explain why it's not subject to harmlessness analysis and why it's harmful? Well, I think, yeah, it is subject to harmless error analysis, I think. But we had like eight, and there were eight conversations that were not sealed. From what I know, none of them were, but eight were not sealed. Eight were not sealed and were played. None of them were properly sealed, but only eight were played to the jury. Three of them go to this transaction on April 15 between Stegman and Turner, one between Stegman and maybe his source, and then three. Turner testified to it, so you need that. You're down to five as you stand there. What do you do with those? So I think the reason that it's not harmless is for the reason that the calls between Stegman and this person named Delilah Saunders, in which he's heard to make racial epithets, misogynistic language, and threatening language. This court recently issued a decision in Cummings about threats to kill. He does say, I'm going to kill somebody if they come on my property. It's a bit conditional, I suppose. But nevertheless. Threatening to kill a witness, which was the Cummings case. Right. And that's why I didn't file a 28-J on that, because there are differences, of course. But nevertheless, it is prejudicial to Stegman  to say that if an end derogatory words were, yes. If he comes on my property, I'm going to kill him or her. That invites the jury to convict on an improper basis. And the government emphasized that in their summation. How long was the trial? Three days. But I mean, that is arguing that there's some prejudice in the material that wasn't sealed. That's a little different. That's not exactly the kind of argument as to what prejudice resulted from the failure to seal properly. That's correct, Your Honor. Yeah. And admittedly, an objection should have been made, too, on a separate ground that even if it were introduced, that it should not have been played for a 403 analysis.  with respect to the failure to seal, what adverse consequences resulted from failing to seal it. Right. But the prejudice that attends to that, in this case, is allowing the jury to hear, in the defendant's own words, a threat to a rather salacious threat. And whether that is a direct connection to the violation or not, I think the fact is still that the prejudice was there. You've reserved a couple minutes for rebuttal. Thank you, Your Honor. We'll hear your answer. We have the government. Good morning. Good morning. May it please the court, Fanula Tessier on behalf of the United States. The evidence against Mr. Stegman in this case was truly overwhelming. Unearthed at his house, on his property, and on the adjoining property were hundreds of thousands of dollars in cash, tens of thousands of dollars in drugs, over 600 grams of cocaine, enough heroin for over 1,000 doses. Right, but the argument is that most of it shouldn't have come in, either because the wiretap was not awfully authorized or the search was defective. So why don't you deal with those issues? We know what the evidence that went in showed. Certainly, and there's several buckets of evidence here. Of course, the government has conceded that the eight phone calls should not have been admitted at trial because of the sealing error. But we argue that the derivative evidence nonetheless comes in because of this court's decision in Emanuel, saying that a sealing error does not require suppression of evidence obtained pursuant to a search warrant relying on those recordings. Mr. Stegman raises a variety of other arguments regarding the aerial surveillance and the evidence seized from his home and from the adjoining property, but those arguments are without merit. As to the evidence seized from his home and the adjoining property, there are sort of two buckets of evidence there that he contests. First is the evidence that was found on the foodie property. And of course, as the district court found, he had no standing to challenge the seizure of the evidence found on the foodie property. He had no reasonable expectation of privacy in a rock pile in a wooded area. Isn't it really a family compound? I mean, the foodies are his grandparents. That's correct. Presumably, they didn't object to his going on their property. They probably would like to see as much of him as they could. That may be the case, but just because that doesn't mean that he had a reasonable expectation of privacy in that area. It was an open field, as the district court observed in one of the rulings on this. You could see that property from open fields. And so he had no reasonable expectation of privacy. You're referring to the open fields on the ground or in the aerial surveillance? Well, it comes into play in both arguments. So as to the argument that the foodie evidence should have been suppressed, one of the questions is, did Mr. Stegman have a reasonable expectation? Well, the question is, did he have a reasonable expectation of privacy in that area? I'm not sure I understand. Are you saying that he didn't have an expectation of privacy in that area because he didn't own that land or just because he wouldn't have had it, even if he did own it, because it was open land? Both, Your Honor. Both go into the analysis. Of course, it's one looks at all. So there is precedent that one does not have a reasonable expectation of privacy in one's own fully-owned open land within the bounds of one's property? That's correct. So this court's decision in Hayes found that the defendant had no reasonable expectation of privacy in scrub brush that was located 65 feet from the defendant's property. No, that's not what I was asking. You say 65 feet outside his property? No, it was on, I apologize, it was on the border of his property, but it was on his property. It was within his property. That's correct. That's correct. It was within his property. You're saying no reasonable expectation on one's own property because of the open character of the land? That's correct. And that's done as the original curtilage analysis case out of the Supreme Court. And that involved a large parcel of land owned by the defendant. And the question was whether he had reasonable expectation of privacy in various parts of the land. So just the fact that you own the land doesn't mean that you have a reasonable expectation of privacy. You have to look at the land and what the uses are. Now, you do have a reasonable. As to the fact that he didn't own the land, that it was owned by his grandparents, is it part of your argument then that he was exposed at least to any persons that his grandparents, the foodies, would allow onto the land? Certainly, that is part of the analysis. That's not the entire analysis. The fact that he was welcome to use the land by invitation of his grandparents, that didn't prevent him from being exposed to the risk that they might allow people, gardeners, whoever, anybody, to come in to fix things, to guests, whatever. That's correct, Your Honor. And so all of the done factors in this case argue against a finding of reasonable expectation of privacy. The distance between his home and the area where the drugs and gun in the rock pile were found was large. It was 350 feet. That's more than the 65 feet this court analyzed in Hays. It was not, there's not evidence that the entire area was within a single enclosure. Officer Hyde testified that there were no fences surrounding the foodie property. The nature of the uses to which the area is put, it was not used for intimate purposes. In Riley, for example, the area found to be within the cartilage of the home was a cottage and surrounding gazebo and land that the defendant used to house guests and that he had once, at one point, lived in. But there were no structures. In this instance, some of the observations were made of Mr. Stegeman on his own property, correct? And even within the cartilage of his own property. So that's the aerial surveillance, Your Honor. And that's a separate question. So first, the question as to the search warrant evidence is, did he have a reasonable expectation of privacy in the rock piles on the foodie property? And we say he did not. As to the aerial surveillance, that is a separate question. Because there was, the answer is that the Supreme Court has repeatedly stated that visual surveillance does not constitute a search. Visual surveillance, I think that case was 400 feet in the air. You can look at a plane or a helicopter and you can see a lot of things. Here, the airplane was 8,000 feet in the sky. You couldn't see a thing. Everybody would be like little ants running around. But they used visual enhancement devices. That's a major wrinkle in this case. So they used the same type of photographic equipment that was at issue in Dow, where the Supreme Court found no reasonable expectation of privacy from a similar height. I would note, though, taking a step back on this, Mr. Stegman did not waive his challenge to the aerial surveillance in district court. That was the district court's ruling, said that he didn't properly advance that argument. Mr. Stegman then waived. So this court's analysis should be, did the district court abuse its discretion in finding that argument waived? Mr. Stegman waived his challenge to the district court's waiver ruling by only raising the waiver ruling in a footnote in his opening brief. And of course, the district court did not abuse its discretion in finding that challenge waived. The Northern District of New York local rules, much like the rules of appellate procedure, require that a defendant not merely state what his claim is, but also provide the facts and the law supporting that argument. And Mr. Stegman did not do that in his many briefings to the district court. May I ask you a question about exactly what the video surveillance entailed? I gather some of it captured the defendant while he was on a public road. That's correct, Your Honor. And my understanding there is you're arguing that whether he was viewed from a few feet away or from 4,000 feet in the air, he had no expectation of privacy in what he was doing on a public road. That's correct. Even assuming that visual surveillance constitutes a search, he had no reasonable expectation of privacy. Where else besides the public road was there enhanced visual surveillance? Because I understood that the infrared surveillance that you were trying to do on the home yielded no evidence that was admitted. That's correct, Your Honor. So what besides on the public road is captured by enhanced visual surveillance? Just before I answer that question, I'd like to note the infrared surveillance was not on his home, but on the property. But as to the aerial surveillance video, there is video of Mr. Stegman leaving his home and also accessing various parts of his property. For example, he accesses the shed where the narcotics were found prior to the drug deal with Mr. Turner. And on all those areas, you're acknowledging that he has some privacy rights to assert, right? I think he has a stronger argument of a reasonable expectation of privacy in, for example, the shed area that was closer to his house. Of course, this wasn't addressed in the district court record below because Mr. Stegman waived the argument. And it's entirely possible that he did not have a reasonable expectation of privacy in that shed. But certainly, his expectation of privacy there is much stronger than, say, on the roads or on the foodie property. And why do you think that that expectation does not include not having people look at you from 4,000 feet in the air with enhanced technology? Well, I think because the Supreme Court has said that visual surveillance does not constitute a search. I'd note that in Sorella, for example, which involved a helicopter, the- Well, it involves what you reasonably expect people could see. You know, in close urban areas, you expect that your neighbors may be able to see you on your front porch, maybe even can see you through your front window. But this is a very different environment. And the way it was viewed is very different from what we're talking about, the expectation that people in close quarters have about being seen. Well, and that's part of the reason I'd point you to Sorella. In that case, the defendant had erected a two fences, a six-foot exterior fence, a 10-foot interior fence, blocking off his entire property from public view. And the court still found that he had no reasonable expectation of privacy in the view from above. In this case, you had a privacy fence around part of Mr. Segman's home. But the areas that he was observed in were visible. Some were visible from the public road. Some were visible from the foodie property, which is an open field. And this court, in looking at reasonable expectation of privacy, I'm sorry, not this court, the Supreme Court, has not just looked at what you can see from the road, but also what you can see from your neighbor's yard or from an open field next door. That way, I mean, the property is surrounded on two sides. The entire foodie property was surrounded on two sides by dense vegetation. And then on another side, the road was lower than the slope of the land. So you really can't see what's far away on a plateau. But, Mr., if officers had gone onto the foodie property and observed Mr. Segman approaching his shed from the foodie property, he could not have challenged that visual surveillance. I think that the- I mean, not only, he could have been observed not only from the foodie property, but from just outside the foodie property. That's correct, Your Honor. The fact that there were trees around the foodie property didn't prevent somebody from going outside the foodie property among those trees and looking in to his property across the foodie property. That's correct, Your Honor. And this court said in Hays that the existence of vegetation, natural vegetation, does not create a reasonable expectation of privacy. I'd also note that if you look at the- defendant did not raise the Jones concurrences in his brief. But I was rereading those concurrences last night. And I think they're really helpful. Because the court, to the extent that the concurrences were concerned about ongoing, repeated visual surveillance that allows you to see everything that a defendant is doing, that was in the context of new technology that makes it cheap, inexpensive, and easy for you to track every single movement of a particular defendant. And the concurrences contrasted that with traditional visual surveillance techniques, which they said are lengthy and expensive and might require, for example, aerial support, and specifically discuss getting aerial surveillance support. And so the concerns that one might have about being able to track someone's every movement just don't exist in this case, where you had, on five separate occasions, expensive airplane equipment surveilling Mr. Stegman's movements. And again, I would go back to the majority opinion in Jones that said that visual surveillance does not. The Supreme Court has never held that visual surveillance constitutes a search. I would just like to answer one question that Judge Radji had about what case law supports the notion that if you have a warrant that has some, perhaps, overbroad language about territoriality, but was properly applied, that that warrants suppression of evidence. I'd note, first of all, here, the only question is whether that requires suppression of derivative evidence. But in any event, there is no case so holding. Glover, which is the DC Circuit case that said that facial insufficiency requires a mechanical suppression. First of all, I think that case miscited Giordano, which is the 1970 Supreme Court case. Giordano did not make that distinction between facial insufficiency and unlawfully intercepted recordings. But in addition, Glover expressly left open the possibility that a mere technical defect would not require suppression. Of course, Glover addressed mobile interception devices, not listening posts. DADA is the first case to find that overbroad language in a warrant constitutes facial insufficiency. A couple of things there. I think that the language here is somewhat different from the language in DADA. And when read in context, it makes clear that the mobile devices were allowed to travel outside the jurisdiction, but did not necessarily allow that the listening post could be outside the jurisdiction. But in any event, in DADA, the court found that this technical defect didn't require suppression. Because of course, the recordings were lawfully intercepted as they were here. Thank you. Thank you, Your Honor. Mr. Egan. Thank you. A technical defect would be a missing page. The magistrate's authorization, but a lack of signature. Something that everybody understood would be present, but was missing. This is language that's in the order that gives direct authorization to intercept outside the jurisdiction. And there's no difference between this language in the warrant here, and the language in the warrant in DADA. As far as adversary touches on Glover's treatment of Giordano, I think that Glover got it right, actually. I mean, Giordano is talking about core concerns with respect to subsection 1. Because if core concerns apply to all the subsections, then subsection 2 and 3 would be superfluous. Jones is different, because tracking movements of cars or people through public roadways is one thing. But tracking them as they leave their house, and they stand next to it in their backyard, immediately surrounding their house, is an entirely different thing. I'm not sure. How do you deal with the argument that this is waived, or if not waived, forfeited? And if forfeited, that it's not clearly established, that you couldn't have done this kind of surveillance in light of the camera use in DOW? Well, so the waiver in the district court level, I think, was incorrect. Stegman offered the disks, or mentioned them at least. And the disks were available for the district court fax. He cited the Fourth Amendment. He said that the aerial surveillance violated his Fourth Amendment right to privacy. I don't know what more he needed to say. Clearly, he could have expanded on that. He didn't cite any cases. He didn't cite any cases. But all the cases were on their face against him. I mean, he needed to distinguish them and show why this was different. Obviously, that would have been better had he done so. But it was enough for the district court to rule on. The government understood the argument. They responded to it. And the district court found that it was waived, but also, on the alternative, denied it for the reasons offered by the government. Stegman also offered the reasons and amplified them in a reconsideration motion, which, again, was ruled on. And so far, if that's not enough to present it, then it's merely one component of the bigger picture. And really, I didn't get to talk about it, but the necessity problem, it really ties into the necessity problem, more so than on its own, I would say, in that the officers completely failed to mention that they were doing this, that they had the capability of doing it, that they were doing it, that it was yielding useful information. And that violated the necessity requirement and should have led to the dispersion. Thank you. Thank you. Thank you both. We'll reserve decision.